**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| WILLIAM LEE HALTER O/B/O | § | |
| MELISSA HALTER (DEC'D), | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:21-CV-00262-SDJ- |
| v. | § | CAN |
| | § | |
| COMMISSIONER, SSA, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff William Lee Halter, on behalf of Melissa Halter, deceased, brings this appeal for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") pursuant to 42 U.S.C. § 405(g), denying Melissa Halter's claim for benefits. After reviewing the Briefs submitted by the Parties, as well as the evidence contained in the administrative record, the Court recommends that the Commissioner's decision be **AFFIRMED**.

**BACKGROUND**

**I.      PROCEDURAL HISTORY OF THE CASE**

On October 30, 2018, Melissa Halter ("Decedent") filed an application for disability and disability insurance benefits under Title II ("Title II") of the Social Security Act [TR 38, 193-194]. On May 27, 2020, Decedent passed away following a cardiac arrest event [TR 676, 687-717], and on July 24, 2020, Plaintiff William Lee Halter ("Plaintiff"), husband of Decedent, filed a Notice Regarding Substitution of Party Upon Death of Claimant, substituting himself as claimant on behalf of his deceased wife [TR 181].

Decedent alleged an onset of disability date of August 12, 2014 [TR 38, 99]. On February 21, 2019, the claim was initially denied [TR 117-120], and again upon reconsideration

on May 22, 2019 [TR 124-26]. Decedent requested an administrative hearing ("Hearing") [TR 128-29], which was held via telephone on April 16, 2020, before an Administrative Law Judge ("ALJ") due to the extraordinary circumstance presented by Coronavirus pandemic [TR 38, 54, 282]. At Hearing before the ALJ, Plaintiff amended the onset date to May 1, 2017 [TR 56]. The ALJ heard testimony from Decedent, Decedent's attorney representative, and a vocational expert ("VE") [TR 52-97]. Decedent passed away after Hearing, but prior to the ALJ decision [TR 38].

On September 2, 2020, the ALJ issued an unfavorable decision [TR 35-51]. After hearing testimony and conducting a review of the facts of Decedent's case, the ALJ made the following sequential evaluation [TR 38-46]:[1] At step one, the ALJ found Decedent had not engaged in substantial gainful activity during the period from her alleged onset date, through her date last insured of June 30, 2017 [TR 40-41]. At step two, the ALJ found Decedent had the following severe impairments: anxiety disorder and bipolar disorder [TR 41]. At step three, the ALJ found Decedent did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526) [TR 41-43]. At step four, the ALJ determined Decedent had the following residual functional capacity:

---

[1] Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520. First, a claimant who is engaged in substantial gainful employment at the time of her disability claim is not disabled. *Id.* § 404.1520(b). Second, the claimant is not disabled if her alleged impairment is not severe, without consideration of her residual functional capacity, age, education, or work experience. *Id.* § 404.1520(c). Third, if the alleged impairment is severe, the claimant is considered disabled if her impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* § 404.1520(d). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered to be disabled if she can perform her past work based on her residual functional capacity. *Id.* § 404.1520(e). Finally, a claimant who cannot return to her past work is not disabled if she has the residual functional capacity to engage in work available in the national economy. *Id.* § 404.1520(f). Under the first four steps of the analysis, the burden lies with the claimant to prove disability, and at the last step, the burden shifts to the Commissioner. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). If at any step the Commissioner finds that the claimant is or is not disabled, the inquiry terminates. *Id.*

> [C]laimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: Claimant could understand, remember, and carry out simple, routine tasks; make simple, work-related decisions; and tolerate occasional changes in the work setting. Claimant could have occasional contact with supervisors and co-workers but only on a superficial basis, meaning no collaborative or tandem work. Claimant could perform jobs that do not require interaction with the public.

[TR 43-45].  Continuing the step four analysis, the ALJ found Decedent was unable to perform any past relevant work [TR 45].  At step five, the ALJ found that, through the date last insured, there were jobs that existed in significant numbers in the national economy that Decedent could have performed, considering her age, education, work experience, and residual functional capacity [TR 45-46].  Thus, the ALJ concluded Decedent was not under a disability as defined in the Social Security Act, at any time from May 1, 2017, the amended alleged onset date, through June 30, 2017, the date last insured [TR 46].

On October 30, 2020, Plaintiff requested review of the ALJ's decision by the Appeals Council [TR 182-84].  The Appeals Council denied Plaintiff's request on January 26, 2021, making the decision of the ALJ the final decision of the Commissioner [TR 19-24].  On March 30, 2021, Plaintiff filed the instant suit on behalf of Decedent [Dkt. 1].  Plaintiff filed his Opening Brief on September 15, 2021 [Dkt. 11], the Commissioner filed its Brief on November 15, 2021 [Dkt. 13-1], and Plaintiff filed his Reply Brief on January 10, 2022 [Dkt. 18].

## II.    STATEMENT OF RELEVANT FACTS

### 1.    *Age, Education, and Work Experience*

Decedent was born on June 2, 1973, making her forty-four (44) years of age on the date last insured [TR 45, 99, 108, 193].  Decedent's age classification at all relevant times was that of a "younger person."  *See* 20 C.F.R. § 404.1563(c).  Decedent has a college degree [TR 58, 65-66,

72], and has past work experience as an accounts receivable clerk, a receptionist, an animal shelter clerk, and a sales attendant [TR 45, 60-65, 91].

### 2. *Relevant Medical Records Before the ALJ*

The ALJ found Decedent had the severe impairments of anxiety disorder and bipolar disorder [TR 41]. Relevant to Decedent's condition(s) and the substantial evidence arguments raised by Plaintiff are the medical opinions and evaluations from Dr. H. Neil Jacobson, M.D. ("Dr. Jacobson"), and State Agency Psychological/Medical Consultants Judy Strait, Psy.D., and Sarah Jackson, Ph.D. (together, "SAMCs"). In connection with a summary of these records, the Court reiterates the relevant period of disability is May 1, 2017, through June 30, 2017 [TR 39].[2]

#### a. Treating Physician – Dr. Jacobson

Dr. Jacobson treated Decedent from September 10, 2015, through May 13, 2020, for generalized anxiety disorder ("GAD"), depression, anxiety, panic attacks, and bipolar disorder [TR 510-553, 667-68, 681-86]. Dr. Jacobson prescribed Decedent multiple medications to treat her anxiety and depression and counseled Decedent as to strategies for "coping with depression" and/or "depressed mood" [TR 511-12, 514, 516, 518, 522, 524, 526, 528, 536, 538, 540, 542, 544, 548, 667, 683]. During Decedent's five-year treatment history, Dr. Jacobson consistently reported that Decedent was stable and that she frequently denied psychotic, depressive, or anxiety symptoms [TR 512, 514, 516, 518, 520, 522, 524, 526, 528, 530, 532, 534, 536, 538, 540, 542, 544, 548, 683]. On May 11, 2017, Dr. Jacobson diagnosed Decedent with GAD [TR 546-47]. The exam record notes:

---

[2] Evaluating the medical evidence in the record at step four, the ALJ noted that "the majority of the medical evidence in the record is dated prior to the alleged onset date or after the date of last insured" [TR 44]. In other words, the majority of the medical evidence falls outside the relevant period of disability of May 1, 2017 through June 30, 2017. Nonetheless, the ALJ "look[ed] longitudinally at claimant's psychiatric treatment with Dr. Jacobson" [TR 44].

Ms. Halter's mental status has no gross abnormalities. Her dress and grooming are appropriate, she is friendly and communicative, and she appears to be her stated age. Mood is euthymic with no signs of depression or manic process. Her speech is normal in rate, volume, and articulation and language skills are intact. Suicidal or self injurious ideas or impulses are denied, as are assaultive or homicidal ideas or intentions. She denies hallucinations and delusions and there is no apparent thought disorder. Associations are intact. thinking is generally logical, and thought content is appropriate. Her cognitive[] functioning, based on vocabulary, and fund of knowledge[] is intact and age appropriate, and she is fully oriented. There are no signs of anxiety. There are no signs of attentional or hyperactive difficulties. Insight and judgment appear intact.

[TR 546].  At that treatment visit, Dr. Jacobson also indicated "[t]here is no history of depressions, anxiety attacks, or other common psychiatric symptoms" [TR 546].  This record from Decedent's May 11, 2017 visit appears to be the only objective medical evidence from Dr. Jacobson that took place during the relevant period of disability [TR 546-47].  On March 4, 2020, prior to Hearing but after the date last insured, Dr. Jacobson added an additional diagnosis of bipolar disorder I [TR 667-68].

On May 14, 2020, subsequent to Hearing and at the request of counsel, Dr. Jacobson completed a Medical Source Statement using a check-box form and answered interrogatories from Decedent's attorney [TR 670-75].  In his interrogatory responses, Dr. Jacobson indicated Decedent had the following psychiatric conditions: anxiety, including manifestations of panic disorder or agoraphobia, and bipolar/depression characterized by depressive symptoms, which were present since May 1, 2017 [TR 670-73].  Decedent's mental disorders were diminished by treatment, therapy, psychosocial supports, and structured settings, though she still has "marginal adjustment" in adapting to changes in her environment and demands that are not already part of her daily life [TR 672].  More specifically, Dr. Jacobson opined that "[o]ngoing medication support and counseling have helped keep Ms. Halter's most severe symptoms under check, but adding more demands to her daily routine would likely cause an exacerbation of her symptoms" [TR 672].  The

Medical Source Statement addressed Decedent's limitations in several functional areas [TR 674-75]. In the category of "understanding and carrying out instructions," Decedent had "no significant loss of ability" to carry out simple instructions and deal with "standardized situations with occasional or no variables," while she was not "totally precluded" but had a "degree of limitation [] such as to interfere seriously" with her ability to carry out instructions and to deal with problems with "several" concrete variables, and to her ability to carry out "detailed but uninvolved" instructions and to deal with problems with "a few" concrete variables [TR 674]. In the category of "sustained concentration and persistence," Decedent had no significant loss of ability to carry out "very short and simple instructions"; had "some loss of ability but [was] still capable of consistently performing" ordinary routine without special supervision, and had some limitation, but not totally precluded, from carrying out on a sustained basis the ability to "maintain attention and concentration for extended periods"; and had "extreme loss of ability to perform" a "normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number" of breaks or rest periods [TR 674]. In the category of "responding appropriately to supervision, co-workers, and usual work situations," Decedent had no significant loss of ability to as simple questions or request assistance; was not "totally precluded" but had a "degree of limitation [] such as to interfere seriously" with her ability to "interact appropriately with the general public" and her ability to get along with coworkers and peers without distracting them; and she had "extreme loss of ability" to "accept instructions and respond appropriately to criticism from supervisors" [TR 675]. In the category of "adapting to changes in a routine work setting," Decedent was not totally precluded but had limitations that interfered with her ability to respond appropriately to changes, while she had "extreme loss" of ability to "cope with normal work stresses without exacerbating" her psychological symptoms

[TR 675].   Dr. Jacobson's Medical Source Statement concluded Decedent had "impaired functioning" since May 1, 2017, but she could still manage her benefits in her own best interest [TR 675].

### b.  State Agency Psychological/Medical Consultants

At the initial level, Judy Strait, Psy.D. ("Dr. Strait") completed a medical evaluation of Decedent that found a primary impairment of Depressive, Bipolar and Related Disorders, and a secondary severe impairment of Anxiety and Obsessive-Compulsive Disorders [TR 103].   The evaluation included a Psychiatric Review Technique ("PRT") analyzing mental impairment Listing 12.04 (Depressive, Bipolar, and Related Disorders), Listing 12.06 (Anxiety and Obsessive-Compulsive Disorders), and Listing 12.11 (Neurodevelopmental Disorders) [TR 103].   The PRT noted Decedent did not meet the paragraph A criteria for Listing 12.04, Listing 12.06, or Listing 12.11 [TR 103].   As to the paragraph B and paragraph C criteria, the PRT noted there was insufficient evidence to establish if the criteria were met [TR 103-04].   Decedent had no medical records for the year prior to the date last insured; therefore, Dr. Strait concluded that the record did not contain sufficient evidence to make a medical decision for the relevant timeframe, and thus Decedent was found not disabled [TR 104-06].   On reconsideration, Dr. Sarah Jackson ("Dr. Jackson") reached the same conclusions, finding that upon consideration of the medical evidence of record, Plaintiff had severe impairments of Depressive, Bipolar and Related Disorders, and for Anxiety and Obsessive-Compulsive Disorders [TR113].   Dr. Jackson similarly found insufficient evidence to indicate whether Decedent satisfied the paragraph B or paragraph C criteria of Listing 12.04, Listing 12.06, or Listing 12.11 [TR 113-14].   Dr. Jackson determined Plaintiff was not disabled [TR 115].

### 3. *Hearing Testimony*

### a. **Decedent's Testimony**

On April 16, 2020, the ALJ held a Hearing [TR 52-97]. At Hearing, Decedent testified regarding her impairments and limitations [TR 59-69]. Decedent had worked as a salesperson in an art gallery, an adoption counselor for an animal rescue, a receptionist, as office-support staff, and as an accounts receivable clerk [TR 58-65]. She testified that she had not looked for employment due to "restrictions on leaving the house, feeling judged, nervousness, [her] bipolar disorder, [and] lack of interest in things [,] [a] whole host of mental issues that I needed therapy for" [TR 65]. Decedent further struggled to find a job because she is not reliable due to her mood swings, bipolar disorder, panic attacks, and sleeplessness [TR 66]. Decedent wore pajamas "ninety percent of the time," rarely leaves the house, "only cooks microwave meals," and did not have social media because she is "scared of being judged" [TR 66, 83]. She testified her bipolar disorder diagnosis was made "before 2015" and that, at one point, she was doing in-patient treatment for mood disorders [TR 66-67]. Decedent expressed that until she received a diagnosis, she felt misjudged, out of control, and misunderstood [TR 67]. She left a temporary job due to feeling bullied by coworkers [TR 68].

Decedent testified she has a low appetite and suffers from physical stomach illness and weight fluctuations due to stress [TR 71]. Decedent was diagnosed with anxiety in 2017, and has since experienced "chronic panic attacks, sleeplessness, and over-thinking" [TR 72]. During a panic attack, Decedent said it felt like "dying," and she experienced sweating, shaking, restlessness, problems with sleeping and concentration that last longer than fifteen minutes [TR 73-74]. She believed that "putting [her] in any work situation would cause [her symptoms] to worsen [TR 74]. She mostly experienced "full-blown panic attacks" when she leaves the house,

and experiences milder symptoms in her home because she feels safer at home [TR 75]. As to the frequency of her panic attacks, Decedent was not sure how often she would have them, but she primarily associated her panic attacks with leaving the house [TR 75-77].

Decedent left her home to get groceries, usually once or twice a month [TR 76-77]. After experiencing a panic attack, Decedent needed "a couple of hours" to recover [TR 77-78]. She had problems with crowds, which she attributed to many of her troubles in the workplace, including anxiety resulting from criticism by supervisors or coworkers [TR 79, 82]. Decedent also testified to having mood swings from her bipolar I disorder, intrusive thoughts about being bullied, judged, and discriminated against in the workplace, and family issues [TR 79-80]. Decedent also experienced lethargy, irritability, lack of interest, low self-esteem, difficulty focusing, and lack of sleep for days [TR 80-82]. Decedent testified that she could only do housework for about 30 minutes at a time and could only drive short distances because of her lack of focus and distractibility [TR 83-85]. Occasionally, Decedent would try to go to a movie during the week when no one is there as a distraction [TR 86]. She was attempting to find a new therapist and psychiatrist but was struggling due to the coronavirus pandemic [TR 87].

### b. VE's Testimony

The VE testified about Plaintiff's past employment history and responded to hypotheticals and questions from the ALJ and Decedent's attorney representative [TR 90-95]. The VE first classified Plaintiff's past work as follows:

> The first one's going to accounts receivable clerk, DOT 216.482-010. It's a sedentary level job, SVP: 5. Then I have receptionist, DOT 237.367-038, sedentary, SVP: 4. The animal shelter clerk, DOT 249.367-010, sedentary, SVP: 3. And finally, sales attendant, DOT 299.677-010, light, SVP: 2.

[TR 91]. The ALJ posed two hypotheticals to the VE [TR 91-93]. The ALJ presented the following hypothetical to the VE:

Turning to hypothetical questions, I would like for you to consider an individual of the Claimant's age, education and prior work history. In hypothetical individual number one is someone who can do the following. This person can perform work at all exertional levels. The individual can perform simple and routine tasks, can tolerate occasional changes in the work setting, can make simple work-related decisions, and can perform jobs that require no more than occasional and superficial interaction with coworkers. And by superficial interaction I mean no collaborative or tandem tasks. And the individual can perform jobs that do not require interaction with the general public as part of the job duties. For hypothetical person number one those are all of the limitations. Would there be any work in the national economy for this individual?

[TR 91-92]. The VE testified that none of Decedent's past work would fit that hypothetical [TR 92]. In terms of other work, such an individual could perform the position of dishwasher, medium-level, SVP: 2 (DOT 318.687-010); price marker, light work, SVP: 2 (DOT 209.587-034); and housekeeping cleaner, light work, SVP: 2 (DOT 323.687-014) [TR 92-93]. For the second hypothetical, the ALJ added an additional limitation that the individual could have no more than occasional supervisor contact [TR 93]. The VE testified that the same jobs would remain available [TR 93]. Each of these jobs exist in the hundreds of thousands in the economy [TR 92-93]. The attorney representative asked how often an individual could miss work at these jobs, to which the VE testified that any more than one day per month would preclude employment, as would being off task more than 10% of the workday [TR 93-94]. The VE was less certain about the preclusive effects of a limitation related to difficulty receiving criticism [TR 94]. The VE confirmed no conflict existed between her testimony and the DOT, clarifying however that absenteeism, off-task behavior, the ability to receive criticism, contact with supervisors, and coworkers are "outside of the DOT" [TR 94-95].[3]

---

[3] Information based on supervision was provided based off the VE's education and professional experience [TR 95].

###### c.  Attorney Representative Testimony

Decedent's attorney representative noted the SAMCs did not have Dr. Jacobson's records before them at the time of their findings [TR 95].  Decedent's representative further advised he was trying to get a Medical Source Statement from Dr. Jacobson, and requested that if the ALJ ultimately found that source statement not persuasive to send Decedent for a consultative examination [TR 95-96].  The ALJ responded:

> I think the issue with the consultative exam, Mr. Burkhalter, is we have a date last insured of June 30th of 2017. We're now well beyond that -- almost three years beyond that. So the value [at] this point of a consultative examination won't really shed any light on the Claimant's condition as of June 30th of 2017. So that's why I don't -- regardless of what my assessment of Dr. Jacobson's opinion is, I don't think a psychological C.E. would be in any way helpful.

[TR 96].

### 4.  *Record Evidence Related to the ALJ's and Commissioner's Constitutional Authority*

It is undisputed that the constitutional challenge(s) to the ALJ and Commissioner's authority were raised by Plaintiff before both the ALJ and the Appeals Council [TR 286-90].  The relevant evidence related to these challenges is summarized as follows:

On July 27, 2020, after the Hearing but prior to the ALJ's decision, Plaintiff sent correspondence to the ALJ, Judge Susanne Cichanowicz ("Judge Cichanowicz"), "objecting to the hearing held on April 16, 2020" on the grounds that "there is no legally valid Commissioner of SSA" and the ALJ "lacked authority to issue a decision without the valid appointment of a Commissioner" under the Supreme Court's decision in *Selia* [TR 286-87].  Plaintiff urged that "because the ALJ was not properly appointed, the ALJ cannot render a valid decision" [TR 287]. More specifically, Plaintiff's constitutional challenge urged that neither Acting Commissioner Nancy Berryhill ("Berryhill") nor Commissioner Andrew Saul ("Saul") were ever validly appointed to their respective positions:

> I have no information about how and when the ALJ that is deciding this case was appointed as an Administrative Law Judge. If the ALJ was appointed by Ms. Nancy Berryhill, that appointment was invalid because she was not even the Acting Commissioner of SSA. If the ALJ was appointed by Mr. Andrew Saul, that appointment was invalid because Mr. Saul was never legally appointed Commissioner consistent with the Supreme Court's decision in *Seila Law*. This would also hold true even if the ALJ was reappointed following the Supreme Court's decision in *Lucia v. S.E.C.*, 138 S. Ct. 2044, 201 L. Ed. 2d 464 (2018).

[TR 287]. For relief, Plaintiff "insist[s] on a constitutionally and statutorily valid administrative process including a *de novo* hearing before a validly appointed ALJ" [TR 287]. On September 2, 2020, the ALJ issued her determination, noting Plaintiff raised a constitutional challenge to her authority but refrained from addressing the consideration:

> Claimant's attorney raised a challenge to the manner in which the undersigned was appointed as an Administrative Law Judge under the Appointments Clause to the Constitution, arguing that the undersigned does not have the authority to issue a denial in this case. (Exhibit 22E). I do not have the authority to rule on that challenge and will not address it further in the decision.

[TR 38]. Thereafter, on October 20, 2020, Plaintiff requested review of the ALJ's determination by the Appeals Council [TR 183-84]. On December 14, 2020, Plaintiff sent a letter to the Appeals Council, arguing in support of the request for review that "[b]ecause there is no legally valid Commissioner of SSA, you have no delegated authority to decide this case" [TR 289-90]. He also challenged the ALJ's authority, arguing that "because Judge Cichanowicz was not properly appointed, she cannot render a valid decision" [TR 289]. The letter otherwise verbatim realleges that neither Acting Commissioner Berryhill nor Commissioner Saul were validly appointed, and that neither the ALJ nor the Appeals Council has "any legal authority to issue a denial in this case" [TR 290]. On January 26, 2021, the Appeals Council denied Plaintiff's request for review [TR 19-24]. The Appeals Council considered the constitutional challenge to the Social Security Administration's structure, and denied request for review on this or any other basis:

In support of your request for review, you (through your representative) have submitted correspondence on December 14, 2020, which suggested that the Social Security Administration is unconstitutionally structured. We considered your contentions, but found there was no reason under our rules to review the Administrative Law Judge's decision

We found no reason under our rules to review the Administrative Law Judge's decision. Therefore, we have denied your request for review.

This means that the Administrative Law Judge's decision is the final decision of the Commissioner of Social Security in your case.

[TR 19]. On February 3, 2021, Plaintiff filed a Request for Appeals Council Reconsideration of

Denial of Review [TR 4-18]. Plaintiff's request for reconsideration argues:

The Appeals Council's denial of review only states that such argument was received and considered. The Appeals Council's Notice gives no rationale for its determination. According to the Social Security Emergency Message EM-21002 from the Office of General Counsel when this issue is raised to the Appeals Council:

In considering objections alleging a lack of authority or power to act, it would be appropriate for the AC to indicate whether the objection makes sense in the context of a request for it to act **by granting review**. (Emphasis added).

In this instance the Notice from the Appeals Council makes no mention that EM-21002 was ever considered.

[TR 7-8]. On February 9, 2020, the Appeals Council denied the request for review, stating there

is no basis under the rules to reopen the decision:

On January 26, 2021, the Appeals Council denied a request for review of the Administrative Law Judge's decision. The Council has now received a request that we reopen and change the decision.

Although you submitted a request for review of the Administrative Law Judge's decision, on February 3, 2021, you (through your representative) questioned the agency's authority to act on this matter. We considered your contentions. However, under current regulation and authority, the Appeals Council is responsible for reviewing and acting on all appropriately filed requests for review.

Under our rules, we may reopen (look again at) and change a determination or decision within certain time limits for any of the following reasons.

● New and material evidence.

● A clerical error.

● The evidence considered in making the determination or decision clearly shows that there was an error.

We found no reason under our rules to reopen and change the decision. This means that the Administrative Law Judge's decision is the final decision of the Commissioner of Social Security in your case.

You, through your representative, submitted a letter of contention dated February 3, 2021, 12 pages along with a statement from treating physician Neil Harold Jacobson, M.D. dated January 8, 2021, 5 pages, clarifying his opinion on your mental health.

**Under our rules, you do not have the right to court review of our denial of your request for reopening.**

[TR 1] (emphasis added).

## STANDARD OF REVIEW

In an appeal under § 405(g), a court "reviews a Commissioner's denial of social security disability benefits 'only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence." *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021) (quoting *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021)) (cleaned up); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert denied*, 514 U.S. 1120 (1995); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). Substantial evidence "need not be a preponderance." *Webster*, 19 F.4th at 718 (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)). Conflicts in the evidence are resolved by the ALJ; the Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner, though it will scrutinize the record to determine if evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th

Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995); *Carry v. Heckler*, 750 F.2d 479, 484 (5th Cir. 1985).

## ANALYSIS

Plaintiff urges remand is appropriate on two distinct grounds: (1) the ALJ lacked constitutional authority to render a decision on Decedent's disability application; and (2) the ALJ erred by developing an RFC unsupported by substantial evidence because she rejected the only functional assessment from a medical source in the record [Dkt. 11].

### 1. *Plaintiff's Constitutional Challenge Does Not Warrant Remand*

Plaintiff challenges the constitutionality of the authority of the ALJ, the Appeals Council, and the Commissioner of Social Security to determine Decedent's disability claim on the grounds that the statute governing appointment of the Commissioner limits the removal authority of the President, thereby violating the separation-of-powers [Dkt. 11 at 8-12]. More specifically, Plaintiff urges the appointment statute for the Commissioner, 42 U.S.C. § 902(a)(3) is unconstitutional under the Supreme Court's precedents in *Seila Law LLC v. CFRB*, 140 S.Ct. 2183 (2020) and *Collins v. Yellen*, 141 S. Ct. 1761 (2021) [Dkt. 11 at 9-11]. Plaintiff further advances the ALJ lacked any authority to decide Decedent's claim because she was appointed by a Commissioner who was him or herself appointed under an "unconstitutional statutory provision," citing *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2049 (2018) [Dkt. 11 at 11]. Plaintiff asserts the only appropriate remedy is a "new hearing before a properly appointed official" [Dkt. 11 at 10-11].

In response, the Commissioner agrees that § 902(a)(3) violates the separation-of-powers by limiting the President's authority to remove the Commissioner of Social Security without good cause [Dkt. 13-1 at 5]. The Commissioner urges Plaintiff's constitutional challenge nonetheless fails because Plaintiff cannot show the restriction caused Decedent harm [Dkt. 13-1 at 6]. The Commissioner raises two arguments in support of this contention: (1) the ALJ was validly

appointed and her determination of Decedent's claim authorized because Judge Cichanowicz's appointment was ratified by Acting Commissioner Berryhill (who was not subject to § 902(a)(3)'s unconstitutional removal restrictions); and (2) even if the ALJ and the Commissioner were appointed under statutes with unconstitutional removal provisions, no remand is warranted where Plaintiff fails to show denial of her disability claim was caused by the unconstitutional removal provision [Dkt. 13-1 at 6-12].[4]

By way of background, in *Selia*, the Supreme Court concluded that the statutory restriction on the President's authority to remove the Director of the Consumer Financial Protection Bureau ("CFPB") was unconstitutional because it violated separation-of-powers principles by preventing the President from removing the CFPB Director at will. *Seila Law*, 140 S. Ct. 2183. In *Collins*, the Court similarly found the removal limitation on the Director of the Federal Housing Finance Agency ("FHFA") unconstitutional. *Collins*, 141 S. Ct. 1761. In the wake of these decisions, the Office of Legal Counsel ("OLC") for the Department of Justice issued a memorandum "conclud[ing] that the President may remove the SSA Commissioner at will" and further "that disregarding the constitutionally unenforceable restriction on removal in 42 U.S.C. § 902(a)(3) would not affect the validity of the remainder of the statute." *Constitutionality of the Comm'r of Soc. Sec.'s Tenure Prot.*, 2021 WL 2981542, at *11 (Op. O.L.C. July 8, 2021). The OLC explained,

> Although under *Collins* and *Seila Law* the restriction on removal in 42 U.S.C. § 902(a)(3) is unconstitutional, and thus unenforceable, that conclusion does not affect the validity of the remainder of the statute, including the default term length and succession provisions for the Commissioner. . . . We think it clear that the SSA Commissioner's removal protection is severable from the remainder of the SSA organic statute, just as the Court in *Seila Law* determined that the removal

---

[4] The Commissioner also urges other remedial doctrines prevent the Court from granting Plaintiff the relief sought, including the harmless error doctrine, the *de facto* officer doctrine, the Rule of Necessity, and other important prudential considerations [Dkt. 13-1 at 13-18].

protection provision for the CFPB Director was severable from the remainder of the Dodd-Frank Act.

*Id.* at *10.   Consistent with the guidance from the OLC, numerous courts have subsequently determined that § 902(a)(3)'s removal provision is both unconstitutional and severable from the remainder of the statute.   As one court recently explained:

> The removal provision violates separation of powers principles. For the purpose of the constitutional analysis, the Commissioner of Social Security is indistinguishable from the Director of the FHFA discussed in Collins and the Director of the CFPB discussed in *Seila Law*. As the Office of Legal Counsel emphasized, several features of the Social Security Administration—"a single Commissioner whose term extends longer than the President's, the immense scope of the agency's programs, the Commissioner's broad power to affect beneficiaries and the public fisc, and the [agency's] largely unparalleled structure"—compel the conclusion that the removal provision is unconstitutional. *Id.* at *7.

> But the removal provision is severable from the remainder of the statute. "[O]ne provision of a [statute] may be invalid by reason of its not conforming to the Constitution, while all the other provisions may be subject to no constitutional infirmity."

*Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) (quoting *Seila Law*, 140 S. Ct. at 2208). Indeed, severability is presumed where, as here, "[t]he remaining provisions of the Act are capable of fully independent function, and nothing in the text, structure, or history of the statute makes it 'evident' that Congress would have preferred, as an alternative to a Commissioner who is removable at will, no Social Security Administration at all."  *Id.*

However, relevant to Plaintiff's constitutional challenge herein, the *Kaufman* court, citing the standard outlined in *Collins* and in the specific context of a social security disability case, further explained that in addition to demonstrating a violation of the separation of powers:

> A party challenging an agency's past actions must [] show how the unconstitutional removal provision actually harmed the party—for example, if the President would have removed the agency's head but for the provision or, alternatively, if the agency's head "might have altered his behavior in a way that would have benefited" the party. Claimant therefore must "demonstrat[e] that the unconstitutional

provision actually caused [her] harm." "Absent a showing of harm, we refuse to unwind the decision[ ] below."

Claimant has presented neither evidence nor a plausible theory to show that the removal provision caused her any harm. Claimant does not assert, for example, that the President took an interest in her claim or that the Commissioner directed the Appeals Council to decide her case in a particular way because of the statutory limits on the President's removal authority. Nothing in the record suggests any link whatsoever between the removal provision and Claimant's case.

During oral argument, Claimant asserted that the unconstitutional removal provision affected the "expected value" of Claimant's claim because the Commissioner theoretically could act in more ways than he could have without the removal restriction. That argument is not particularized to Claimant; if we agreed, then it would require us to undo all disability decisions made by the Social Security Administration while the removal provision was operative. We reject the argument. As an initial matter, the reasoning is illogical. Even accepting the questionable premise that the Commissioner might act differently with respect to an individual claimant, the Commissioner just as readily might act in a claimant's favor as in a claimant's disfavor. So, without some evidence of how the Commissioner was inclined to exercise expanded authority with respect to the particular claimant, we fail to see how even the theoretical "expected value" of Claimant's case would change. In any event, the argument rests solely on speculation that the Commissioner theoretically might have acted differently. Claimant cannot meet her burden of showing actual harm with speculation alone.

***In sum, we hold that the removal provision in 42 U.S.C. § 902(a)(3) violates separation of powers; that the provision is severable; and that, unless a claimant demonstrates actual harm, the unconstitutional provision has no effect on the claimant's case.*** Because Claimant has not shown actual harm, we uphold the Commissioner's decision.

*Id.* at 849-50 (internal citations omitted) (emphasis added). Following this reasoning, remand based on separation-of-powers challenges to the Commissioner's removal limitation has repeatedly been denied at the district court level; an unconstitutional removal provision does not automatically void every action of the agency, and to undo the agency action, a plaintiff must show the constitutional provision inflicted harm. *See Tibbetts v. Comm'r*, No. 2:20-CV-872-SPC-MRM, 2021 WL 6297530, at *5-6 (M.D. Fla. Dec. 21, 2021) ("assuming arguendo that the removal provision is unconstitutional, it would not necessitate a rehearing of Plaintiff's claim because the

provision is severable"), *report and recommendation adopted*, No. 2:20-CV-872-SPC-MRM, 2022 WL 61217 (M.D. Fla. Jan. 6, 2022); *Hughes v. Kijakazi,* 2022 WL 1256704, at *21 (E.D. La. Mar. 9, 2022) ("To obtain relief, Mr. Hughes cannot rely on the removal provision alone: he must show that the removal provision harmed him. The fact that an ALJ or the Appeals Council received their authority from the Commissioner is not enough."); *Hernandez v. Comm'r*, 2022 WL 2286801 (D. Ariz. June 24, 2022) ("For Plaintiff to be entitled to relief under the test outlined in *Collins* and adopted in the social security context by the Ninth Circuit in *Kaufmann*, Plaintiff must show that her harm, in this case her unfavorable decision, was tied to the unconstitutional removal provision."). Plaintiff has not shown any such particularized harm. "The injur[y] [P]laintiff asserts here – essentially, that he was subjected to a constitutionally invalid adjudicative process – would apply to every claimant and cannot support a remand order in a specific case." *Green v. Kijakazi*, No. 21-C-678, 2022 WL 1644936, at *24-25 (E.D. Wis. May 23, 2022).

Plaintiff's constitutional argument fails for an additional reason advanced by the Commissioner. Judge Cichanowicz was not unconstitutionally appointed when she heard Decedent's case; her appointment was ratified by the Acting Commissioner, who was removable at will and not subject to § 902(a)(3)'s unconstitutional removal restrictions. Consider, in *Lucia*, the Supreme Court held that administrative law judges for the Securities and Exchange Commission ("SEC") are "Officers of the United States," and, therefore, are subject to the Appointments Clause. 138 S. Ct. at 2055. The Court reversed and remanded the decision of a SEC ALJ on the grounds that they were appointed in violation of the Appointments Clause. *See id*. Shortly after *Lucia*, on July 16, 2018, Acting Commissioner Berryhill ratified all appointments of the then-serving ALJs, approving the appointments as her own and curing any potential *Lucia* challenge based on their initial appointment by an inferior officer other than the Commissioner.

*See* Social Security Ruling 19-1p, *Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) On Cases Pending at the Appeals Council*, 84 Fed. Reg. 9582, 2019 WL 1202036 (Mar. 15, 2019).  On March 15, 2019, the Commissioner issued a ruling addressing Appointments Clause challenges to ALJ determinations based on *Lucia* by publishing Social Security Ruling 19-1p ("SSR 19-1p").  *See id.* at 9583.  Importantly, SSR 19-1p provides notice that the Acting Commissioner, acting consistent with "guidance from the Department of Justice," ratified the ALJ appointments to "address any Appointments Clause questions involving Social Security claims" in the wake of *Lucia*.  *Id.*  The Acting Commissioner took the same actions with respect to the administrative appeals judges who work at the Appeals Council.  *Id.*  Because Judge Cichanowicz's appointment was ratified by Acting Commissioner Berryhill on July 16, 2018, the ALJ was properly appointed when conducting Decedent's hearing on April 16, 2020, and when she issued her disability determination on September 2, 2020 [TR 46; 52].  *See Marrs v. Comm'r,* No. 4:20-CV-00822-BP, 2021 WL 4552254, at *4 (N.D. Tex. Oct. 5, 2021) ("Because the Commissioner ratified ALJ Phillips's appointment on July 16, 2018, and Phillips first heard Marrs's claim on August 23, 2018 and later on November 25, 2019 following remand from the AC, he was constitutionally appointed when he heard her case.").

Plaintiff urges that the ALJ's appointment could not be ratified by Acting Commissioner Berryhill because the Acting Commissioner's own appointment is unconstitutional based on the infirm removal limitation.  The Commissioner correctly rejoins that the Acting Commissioner's authority to assume all duties of the Commissioner arises under the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3346(a)(1) [Dkt. 13-1 at 8 & n.3].  Acting Commissioner Berryhill was therefore legally exercising the Commissioner's duties on July 16, 2018, the date she ratified the appointments of the agency's ALJs and of Judge Cichanowicz.  While Plaintiff argues that if the

Acting Commissioner can serve in the role of the Commissioner, then *ergo*, she must also be subject to the same unconstitutional removal provision applicable to the Commissioner in § 902(a)(3), the Court is not persuaded.  The Deputy Commissioner's appointment provision lacks the removal limitations found in the Commissioner's [Dkt. 13-1 at 8 & n.4].[5]  *Compare* § 902(a)(3) (for the Commissioner, "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office."), *with* § 902(b)(2) (for the Deputy Commissioner, no limitation is included in the appointments provision).  Thus, the unconstitutional removal restriction had no impact on the ALJ in this case.  Numerous other courts have similarly found the Acting Commissioner is not subject to § 902(a)(3)'s removal provision and that her ratification of the ALJs was legitimate.[6]  *See Katherine M. v. Comm'r*, No. C20-6023-MAT, 2022 WL 36891, at *10 (W.D. Wash. Jan. 3, 2022) ("Neither provision governing the Deputy Commissioner or another presidentially designated Acting Commissioner contain removal restrictions."); *Corissa D.B. v. Comm'r*, No. 2:21-cv-1816, 2022 WL 1555111, at *6 (S.D. Ohio May 17, 2022) ("As the Commissioner correctly notes, an Acting Commissioner is not subject to § 902(a)(3)'s removal provision thereby making that provision's constitutionality, or lack thereof, irrelevant."); *Baird v. Comm'r*, No. 5:21-CV-00126-

---

[5] The Commissioner urges the plain reading of the statute indicates the Deputy Commissioner is not subject to the same constitutionally infirm removal provision:

> In a separate subsection, the statute addresses the "Deputy Commissioner of Social Security," who enjoys no removal protection, and is deemed the "Acting Commissioner" during the "absence or disability of the Commissioner . . . unless the President designates another officer of the Government as Acting Commissioner." 42 U.S.C. § 902(b)(2), (4). *Compare*, 42 U.S.C. § 902(c)(1) (providing that the Chief Actuary is removable only for cause). In the absence of plain statutory text providing tenure to an Acting Commissioner—which would be "a singular anomaly in all of administrative law," *Rop v. Fed. Hous. Fin. Agency*, 485 F. Supp. 3d 900, 938 (W.D. Mich. 2020)—a person serving temporarily in an Acting capacity is removable at will. *See Collins*, 141 S. Ct. at 1783 ("[W]e generally presume that the President holds the power to remove at will executive officers and that a statute must contain 'plain language to take [that power] away.'"); *accord Swan v. Clinton*, 100 F.3d 973, 987 (D.C. Cir. 1996) (holding removal protection did not apply to "holdover" officials since "if the President cannot remove holdover officials . . . then holdover members could conceivably remain in office for substantial, indeed unlimited, periods of time").

[Dkt. 13-1 at 8 n.4].

[6] Thus, as a factual matter, there is no separation-of-powers concern in Plaintiff's case.

DAP, 2022 WL 2162846, at *12 (N.D. Ohio Apr. 22, 2022) ("Acting Commissioner Berryhill—who ratified the appointment of ALJ Schmitz—was removable at-will and was not subject to § 902(a)(3)'s removal provision."), *report and recommendation adopted sub nom. Baird v. Comissioner of Soc. Sec.*, No. 21-CV-126, 2022 WL 1516124 (N.D. Ohio May 13, 2022); *Williams v. Kijakazi*, No. 5:21-cv-6-MOC, 2022 WL 821374 at *3 (W.D.N.C. Mar. 17, 2022) ("[T]he ALJ who issued the final decision denying Plaintiff's claim was not appointed by a Commissioner subject to Section 902(a)(3)'s removal restriction. Rather, the ALJ had his appointment ratified by an Acting Commissioner of Social Security—whom the President could have removed from that role at will, at any time. Thus, the removal restriction had no impact on the ALJ's appointment."). Plaintiff's constitutional challenge fails; the unconstitutional removal provision does not necessitate remand or rehearing of Plaintiff's claim.[7]

### 2. The ALJ's RFC Determination Is Supported by Substantial Evidence

The RFC is an assessment based on all the relevant evidence of a claimant's maximum ability to do work on a sustained basis in an ordinary work setting despite his or her impairments. 20 C.F.R. § 404.1545(a); *see Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). The RFC is the most a claimant is able to do despite her physical limitations. The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ is not required to incorporate limitations in the RFC she finds unsupported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991); *Kozlowski v. Colvin*, No. 4:13-cv-020-A, 2014 WL 948653, at *7 (N.D. Tex. Mar. 11, 2014). Moreover, there has never been a requirement in the Fifth Circuit that an RFC precisely match an expert medical opinion. *Dixon v. Comm'r*, No. 4:18-CV-634, 2019 WL 5875901, at *1

---

[7] Plaintiff does not cite, nor has this Court found, any decision from another court that has reached a different conclusion on the merits of Plaintiff's constitutional claim.

(E.D. Tex. Sept. 27, 2019). "Like a trial judge or jury, the ALJ may weigh the competing opinions, take into consideration all of the other evidence of record, and make a finding that may not be exactly the same as the opinion of any one medical source." *D.J.M. v. Berryhill*, No. 18-cv-0193, 2019 WL 1601491, *4 (W.D. La April 11, 2019). The inquiry for the Court is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *see Perez v. Barnhart*, 416 F.3d 457, 461 (5th Cir. 2005).

The Parties do not dispute that Decedent's claim is governed by the new rule for assessing medical opinion evidence that governs all claims filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1520c. The new rule, § 404.1520c, provides that the ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from the [claimant's] medical sources." *Id.* § 404.1520c(a). A medical opinion is a statement about what functional limits a claimant may have from an impairment. *Id.* § 404.1513(a)(2). In determining the RFC, the ALJ shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. *Id.* § 404.1520c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. *See id.* §§ 404.1520(b)(2), 404.1520c(a). Supportability means the degree to which objective medical evidence supports the

medical opinion at issue, and consistency looks to the consistency between different medical opinions across the record. *Id.* § 404.1520c(c)(1)-(2).[8]

Plaintiff argues that by finding Dr. Jacobson "unpersuasive," the ALJ rejected the only objective medical evidence in the record in determining the RFC, and thus the ALJ's findings as to Decedent's limitations are based on her own lay interpretation of the evidence and the RFC is not supported by substantial evidence [Dkt. 11 at 12-16].[9]  The Commissioner urges the ALJ properly considered the medical evidence from Dr. Jacobson relevant to the two-month period at issue and properly applied the applicable rule for considering medical evidence from treating physicians for claims filed under the new rule post-March 29, 2017 [Dkt. 13-1 at 18-24].

Plaintiff is correct that in determining the RFC the ALJ must avoid "playing doctor and making [her] own independent medical assessment."  *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.1990)).  However, the Fifth Circuit has also emphasized that it is not the Court's intent to require the Commissioner to obtain the RFC finding directly from a medical opinion, thereby nullifying the ALJ's role as factfinder. *See Fontenot v. Colvin*, 661 F. App'x 274, 277 (5th Cir. 2016).  Here, the ALJ considered the medical evidence, including Dr. Jacobson's objective medical findings and medical opinions applicable to the Decedent's period of disability (as well as records that fall outside that timeframe) [TR 43-45].  Contrary to Plaintiff's claim, the ALJ did not "play doctor" and inject her own lay

---

[8] "With respect to 'supportability,' 'the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase,'" and consistency is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Luckett v. Kijakazi*, No. 4:20-CV-04002, 2021 WL 5545233, at *4 (S.D. Tex. Nov. 26, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)) (quoting *Vellone v. Saul*, No. 1:20-CV-00261-RAK-HP, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021)).

[9] Plaintiff is incorrect, to the extent argued, that the ALJ must defer to Dr. Jacobson's medical *opinion* regarding Decedent's inability to work because opinion evidence "is inherently neither valuable nor persuasive to the issue of whether [claimant is] disabled." *See* 20 C.F.R. § 404.1520b(c).

medical opinion "by drawing medical inferences on her own that no doctor has expressed" [Dkt. 11

at 14]. Rather,

> After careful consideration of the evidence, the undersigned finds that claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

> The majority of the medical evidence in the record is dated prior to the alleged onset date or after the date last insured. However, looking longitudinally at claimant's psychiatric treatment with Dr. Jacobson, he consistently reported that her behavior was stable and she frequently denied psychiatric problems. (Exhibit 10F). Dr. Jacobson's mental health notes indicate this remained the case until February 2020, over two years after her date last insured. (Exhibit 10F/2-3).

> Although the claimant was in counseling prior to the alleged onset date, the record suggests that claimant stopped counseling around September 2016 and did not resume counseling until August 2018, well after her date last insured. (Exhibits 7F/2-3, 45; 8F/21, 25-26).

> As for medical opinions and prior administrative medical findings, the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinions, including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

> The State agency psychological and medical consultants opined that there was insufficient evidence in the record to determine any physical or mental limitations claimant may have with regard to performing work activities, which was persuauaive [sic] and consistent with the evidence reviewed at that time. However, records received at the hearing level show visits with Dr. Jacobsen just prior to and following the date last insured. Those records indicate that the claimant was doing well on medication as discussed herein. In light of the overall record, however, the undersigned has adopted the limitations noted herein.

> Dr. Jacobson completed forms regarding claimant's limitations in her abilities to perform mental work-related activities. Dr. Jacobson opined that claimant met the criteria of listings 12.04 and 12.06 and stated that claimant was extremely limited in the ability to maintain regular attendance and be punctual within customary tolerances, ability to work in coordination with and in proximity to others without being unduly distracted by them, ability to complete a normal workweek without interruptions from psychological symptoms and an unreasonable number of rest breaks, ability to accept instructions and respond appropriately to criticism from

supervisors, and ability to cope with normal work stresses. (Exhibit 15F). The undersigned finds this opinion unpersuasive, *as it is inconsistent with Dr. Jacobson's own mental health treatment records, which generally show normal functioning, as discussed above. The medical evidence of record prior to the date last insured does not support this opinion.*

[TR 44] (emphasis added).  As a factual matter, the ALJ did not reject Dr. Jacobson's *objective* medical findings [*See* Dkt. 11 at 12-17].  Indeed, the ALJ relied on Dr. Jacobson's objective medical findings that suggest mild to moderate limitations, thus supporting the RFC with findings by a treating physician.  *See Kalka v. Kijakazi*, No. 6:21-CV-00087, 2022 WL 866409, at *1 (E.D. Tex. Mar. 23, 2022) ("Thus, plaintiff's statement that there are no opinions in the record from a treating physician is incorrect; the medical opinions support the RFC.").  The ALJ found unpersuasive the Medical Source Statement completed by Dr. Jacobson post-Hearing and years after the date last insured.  The ALJ concluded the post-Hearing Medical Source Statement, submitted at the request of counsel, was inconsistent with Dr. Jacobson's own objective findings and the medical evidence prior to the date last insured.  *See Jones v. Saul*, No. 4:20-CV-00772-BP, 2021 WL 2895867, at *4 (N.D. Tex. July 9, 2021) ("after considering the medical record as a whole, the ALJ determined that Dr. Davis's opinion was not persuasive because his treatment notes and the medical record did not support the limitations he expressed").  The ALJ complied with the applicable regulations in considering Dr. Jacobson's opinion.  *See Eason v. Comm'r*, No. 6:21CV173, 2022 WL 2183132, at *8 (E.D. Tex. May 21, 2022) ("the ALJ addressed both the supportability and consistency of Dr. Scribner's opinions and identified specific medical evidence to support her conclusions. Plaintiff has not shown that the ALJ failed to properly consider the opinion of Dr. Scribner in compliance with the revised regulations and her finding is supported by substantial evidence."), *report and recommendation adopted*, No. 6:21-CV-00173, 2022 WL 2182696 (E.D. Tex. June 16, 2022).

Plaintiff's further arguments are also not compelling, namely that *Ripley* requires a medical source statement to support the RFC and thus, whether proper or not, rejection of Dr. Jacobson's Medical Source Statement necessitates a finding of no substantial evidence.  "In *Ripley*, the Fifth Circuit held that the absence of a medical source statement describing how the claimant's impairment affects his ability to work 'does not, in itself, make the record incomplete.'"  *See Kalka*, 2022 WL 866409, at *1 (quoting *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).  More recently, the Fifth Circuit has considered and rejected the proposition that where the record was devoid of a residual function capacity (RFC) assessment by a medical source, the ALJ was not competent to assess a plaintiff's RFC.  *Id.* (quoting *Joseph-Jack v. Barnhart*, 80 F. App'x 317, 318 (5th Cir. 2003)).

In addition, the ALJ did not err by finding Decedent's subjective complaints only partially supported by the medical record evidence [Dkt. 11 at 15].  The ALJ may exercise judgment concerning Decedent's testimony and is not mandated to wholly accept all of the allegations as truthful.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).  Indeed, an individual's statements standing alone cannot be conclusive evidence of disability.  *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988).  Nevertheless, the ALJ's considered Decedent's subjective descriptions when considering the severity of her mental impairments at step three.  The ALJ found Decedent had moderate to no limitations in the following functional areas, as defined by the Listing 12.00 paragraph B criteria for mental disorders:

> In understanding, remembering or applying information, claimant had no limitation. Claimant did not need reminders to take medications because she had a system. (Exhibit 6E/3). Claimant wrote down oral instructions so she could read them. (Exhibit 6E/6). Claimant's thinking was typically logical during mental status examinations and her memory, insight, and judgment were intact. (Exhibit 10F).
>
> In interacting with others, claimant had a moderate limitation. Claimant testified that she avoided crowds and typically had panic attacks when she had to leave her

house. (Hearing Testimony). Claimant spoke with others on the telephone daily. (Exhibit 6E/5). Claimant got along fine with authority figures. (Exhibit 6E/7).

With regard to concentrating, persisting or maintaining pace, claimant had a moderate limitation. Claimant testified that she has always been easily distracted. (Hearing Testimony). She did not finish what she started. (Exhibits 5E/6; 6E/6). Dr. Jacobson found no signs of attentional or hyperactive difficulties during his mental status examinations prior to 2020. (Exhibit 10F).

As for adapting or managing oneself, the claimant had a moderate limitation. Claimant reported no problems with self-care tasks. (Exhibit 6E/2). However, her mother noted that claimant stays in her pajamas most days. (Exhibit 5E/2). Claimant's grooming was generally appropriate during her mental status examinations. (Exhibit 10F).

[TR 42]. The degree of Decedent's mental limitations did not point to a disability finding at step three; however, the ALJ considered these functional limitations at step four and five:

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

[TR 41-42]. *See Gonzales v. Colvin*, No. 3:15-CV-0685-D, 2016 WL 107843, at *5 (N.D. Tex. Jan. 11, 2016) ("The ALJ's decision demonstrates that he took into account Gonzales' mental impairments when performing his RFC analysis."). The ALJ thus did not err by finding Decedent's subjective testimony concerning the intensity, persistence, and limiting effects of these symptoms to be not entirely consistent with the medical evidence. *See Hale v. Colvin*, No. 6:16-CV-01215-JDL, 2018 WL 826521, at *5 (E.D. Tex. Feb. 12, 2018) (citation omitted) ("The ALJ determined that Plaintiff's medical evidence had a basis for some of Plaintiff's complaints, but the substantial evidence supported the consultants' conclusions that the degree of pain experienced were out of proportion and inconsistent with the medical findings and expectations, and Plaintiff was therefore not credible. Because the ALJ looked at Plaintiff's subjective complaints against the

entire medical records and opinion evidence to find Plaintiff's complaints were not credible, the Court sees no reversible error based on the record."); *Shuler v. Berryhill*, No. 3:16-CV-1515-BH, 2017 WL 4298132, at *11 (N.D. Tex. Sept. 28, 2017) (citing *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991)) (the "ALJ properly discredited Plaintiff's subjective complaints of pain, and substantial evidence supports [her] decision," where the ALJ noted contradictory medical reports and daily activities). The ALJ's RFC determination is supported by substantial evidence.

Plaintiff urges the Court consider Dr. Jacobson's interrogatories of January 8, 2021 as part of the record, as they were submitted to the Appeals Council even though they were not before the ALJ when she made her determination [Dkt. 11 at 16 n.6]. The Commissioner does not contest that these interrogatories are part of the record on appeal,[10] instead arguing that Dr. Jacobson's interrogatories: (1) do not show the ALJ erred in evaluating Dr. Jacobson's opinions because the new evidence relates to a period after the period of disability; and (2) do not "dilute the record to the point that the ALJ's ultimate finding is insufficiently supported" such that it cannot be deemed supported by substantial evidence [Dkt. 13-1 at 22] (quoting *Higginbotham v. Barnhart*, 163 F. App'x 279, 282 (5th Cir. 2006)). The Commissioner further advances that the interrogatories "appear[] to be an attorney-supplied check-mark form and do[] not include Dr. Jacobson's own specific findings or detailed determinations" [Dkt. 13-1 at 22]. Upon review, Dr. Jacobson's interrogatories do nothing more than attempt to rebut the ALJ's findings by nominally restating his opinion that Decedent's limitations are extreme but without reference to the relevant objective medical evidence. Other courts have rejected similar interrogatories that merely seek to clarify an already-rejected medical source statement. *See, e.g.*, *Motley v. Berryhill*, No. 3:18-CV-00090,

---

[10] Under the Social Security Act, courts may review the final decision of the Commissioner. 42 U.S.C. § 405(g). The final decision encompasses the Appeals Council's denial of review, and the record on appeal includes new evidence accepted for review by the Appeals Council. *Williams v. Astrue*, No. 4:11-CV-483, 2013 WL 1282517, at *3 (E.D. Tex. Mar. 27, 2013) (citing *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005)).

2019 WL 1060894, at *6 (S.D. Tex. Jan. 25, 2019) (finding remand not warranted where the new evidence before the Appeals Council was a second medical source statement submitted as interrogatory answers) ("Following the ALJ's decision that Motley was not disabled, Motley submitted, for the first time, two pages of interrogatory answers dated August 1, 2017 by Dr. Batchu [ ] as 'new evidence' to the Appeals Council."), *report and recommendation adopted*, No. 3:18-CV-00090, 2019 WL 1059977 (S.D. Tex. Mar. 6, 2019). Dr. Jacobson's interrogatories attempt to rebut the ALJ's criticisms of his original medical opinions by purporting to contradict several statements cherry-picked from the ALJ's findings; this is insufficient to show the ALJ's decision is unsupported by substantial evidence. *See Motley*, 2019 WL 1060894, at *7 (internal citation omitted) ("The ALJ criticized Dr. Batchu's First Opinion stating that Dr. Batchu failed to provide 'specific limitations or restrictions' and 'relied on the claimant's self-report[s].' Dr. Batchu's Second Opinion seems to directly rebut these criticisms of the original opinion; however, a mere statement is not enough to overcome the ample medical evidence supporting the ALJ's decision.").[11] These interrogatories, while facially denying some of the ALJ's findings regarding the objective medical evidence, do not provide any further explanation for the degree of limitation Plaintiff urges. *See Bond v. Comm'r*, No. 4:20-CV-00053-O-BP, 2020 WL 7687139, at *5 (N.D. Tex. Nov. 12, 2020) ("Dr. Zashin's medical source statement appears to be a standardized form that contains a limited amount of explanation and does not explain why Dr. Zashin restricted Bond's ability to work to such an extent."), *report and recommendation adopted*, No. 4:20-CV-00053-O-BP, 2020 WL 7253369 (N.D. Tex. Dec. 10, 2020). Plaintiff fails to show that the ALJ

---

[11] Notably, the interrogatories submitted as "new evidence" to the Appeals Council in Motley are substantially similar to the interrogatory answers provided by Dr. Jacobson. *Compare* [TR 25-29], *with Motley*, 2019 WL 1060894, at *6 ("In Dr. Batchu's Second Opinion, he confirmed that Motley was diagnosed with rheumatoid arthritis; stated that the findings from a March 30, 2015 MRI report were consistent with the limitations Dr. Batchu assessed in his March 2017 opinion; and clarified that his March 2017 opinion was 'based on [his] examinations; [his] knowledge of her condition, [his] knowledge of her type of medical conditions and [his] review of other medical records from her rheumatologist.'").

would have reached a different conclusion had she considered Dr. Jacobson's interrogatories.[12][13] In sum, Plaintiff has not shown the RFC is unsupported by substantial evidence.

## CONCLUSION AND RECOMMENDATION

Accordingly, the Court recommends the Commissioner's decision be **AFFIRMED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Services Automobile*

---

[12] Though Plaintiff briefly states that Dr. Jacobson's opinions expressed in the interrogatories "pertain to the time period of May 11, 2017, through May 27,2020" [Dkt. 18 at 3-4], no objective evidence is identified in the interrogatories that "relates to" the period of disability, which is limited to the period between May 1, 2017 and June 20, 2019. As the Court has already explained, Dr. Jacobson only saw Decedent for treatment one time during that two-month period, her treatment visit on May 17, 2017 [TR 546-47]. No reference to this visit can be found in Plaintiff's opening brief or his reply. Crucially, none of the records cited by Plaintiff as longitudinal evidence of her limitations references the May 17, 2017 visit [*See* Dkt. 11 at 17-18] (twice citing over a dozen records from Dr. Jacobson without reference to the sole medical record for the one visit within the period of disability). Comparing Dr. Jacobson's Medical Source Statement considered by the ALJ [TR 670-75] with the interrogatories to the Appeals Council shows this is not a "close call" favoring remand – the medical source statement the ALJ considered is far more detailed than the interrogatory form, and it contains narrative explanations for Dr. Jacobson's opinions that are completely absent from his responses on the interrogatory form (which, notably, provided him space to comment with further detail but which he declined to provide).

[13] Plaintiff briefly urges remand is appropriate with instruction for the ALJ to "obtain a report from a medical source regarding the effects of Halter's severe mental disorders on her ability to work" [Dkt. 11 at 16]. None of the applicable rules, regulations, or caselaw regarding the ALJ's duty to supplement the record or order a consultative exam is briefed by Plaintiff; thus, the Court does not further address this argument. Further, the ALJ stated at Hearing that any further consultative exam would not likely change her disability finding because the relevant period of disability had long since passed, [TR 76] and thus any additional report on remand would similarly not result in a different determination.

*Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 7th day of July, 2022.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE